# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Buffalo Wild Wings International, Inc.,

                              Plaintiff,

                                                    Civ. No. 11-3287 (RHK/LIB)
                                                    **MEMORANDUM OPINION
                                                    AND ORDER**

v.

Grand Canyon Equity Partners, LLC,
GCEP-Goodyear, LLC, GCEP-Surprise,
LLC, GCEP-Scottsdale, LLC, David Agado,
Richard Folmar, Michael Merriman, and
Ceasar Perez,

                              Defendants.

Kerry L. Bundy, Christopher J.L. Diedrich, Faegre & Benson LLP, Minneapolis,
Minnesota, for Plaintiff.

Ronald K. Gardner, Jr., J. Mark Dady, Dady & Gardner, PA, Minneapolis, Minnesota, for
Defendants Grand Canyon Equity Partners, LLC,GCEP-Goodyear, LLC, GCEP-Surprise,
LLC, GCEP-Scottsdale, LLC, David Agado, and Richard Folmar.

## INTRODUCTION

Plaintiff Buffalo Wild Wings International, Inc. ("BWW") alleges that

Defendants—three BWW franchisees, along with a related entity and four individual

guarantors—are infringing its trademarks and breaching the terms of their franchise

agreements by continuing to use its trademarks, trade names, slogans, symbols, etc. (the

"marks") and its system of doing business after their franchise agreements have

terminated.  BWW seeks a temporary restraining order ("TRO") and preliminary

injunction to stop this infringement and require Defendants to de-identify with the BWW brand.  Because the Defendants have received notice and the Motion has been fully briefed, the Court will treat it as one for a preliminary injunction rather than a TRO.  For the reasons set forth below, the Court will grant the Motion.[1]

## BACKGROUND

### I.      BWW and its Franchise Agreements with Defendants

BWW is the franchisor of more than 500 restaurants operating under the name Buffalo Wild Wings and using its marks nationwide.  (Compl. ¶ 1.)  BWW franchises are "grill and bar" restaurants known, as the name suggests, for serving wings.  The instant dispute involves three BWW franchises in the Pheonix, Arizona, area that allegedly continue to operate using BWW's marks even though their franchises have terminated.

BWW entered into a Franchise Agreement with Defendant Grand Canyon Equity Partners, LLC ("GCEP") in January 2004 for a restaurant located in Phoenix, Arizona ("Phoenix Restaurant").[2]  (Id. ¶ 20.)  BWW entered into another Franchise Agreement with Defendant GCEP-Goodyear, LLC ("GCEP-Goodyear") in March 2006 for a restaurant in Goodyear, Arizona (id. ¶ 18) and one with Defendant GCEP-Surprise, LLC ("GCEP-Surprise") in October 2007 for a restaurant in Surprise, Arizona (id. ¶ 19).  The individual defendants are parties to the instant action as guarantors of the Franchise

---

[1] The following constitutes the Court's findings of fact and conclusions of law, as required by Federal Rules of Civil Procedure 52(a) and 65.

[2] Defendant GCEP-Scottsdale, LLC ("GCEP-Scottsdale") apparently claims to be the party in interest regarding the Phoenix restaurant; however, BWW never consented to or approved any transfer of this franchise's ownership.  (Compl. ¶ 21; Essick Decl. ¶ 10.)

Agreements at issue.[3]

BWW's franchisees are authorized to use its trademarks, trade names, service marks, copyrights, building designs and specifications, slogans, logos, and symbols. (Id. ¶ 14 & Ex. A.)  They also gain access to BWW's "System," or its method of doing business, which includes menu items, advertising materials and marketing techniques, bookkeeping systems, and entertainment.  (Id. ¶ 16.)  It also includes manuals containing information such as BWW's operating policies, standards for food and service quality, and other details regarding its business and operations.  (Id.)  BWW has invested substantial time and money into developing its System and considers it extremely valuable.  (Id. ¶ 25.)  As part of each new franchise agreement entered into by BWW, the franchisee must acknowledge the nature of BWW's trade secret, proprietary, and confidential information and must agree not to disclose such information or to compete with BWW during the term of the franchise.  (Id. ¶¶ 26-28; Essick Decl. ¶ 3.)  All of these provisions were part of the Franchise Agreements executed by Defendants, and Defendants received all of the benefits of BWW's System, use of its marks, and initial and ongoing training and support.  (Essick Decl. ¶ 12.)  In exchange for these benefits, Defendants were required to pay various advertising and other fees, make timely rent payments and payments to vendors, accept credit-card payments, and act in a manner that would not impair BWW's reputation or goodwill.  (Id. ¶ 13.)

---

[3] Defendant David Agado personally guaranteed GCEP's obligations under the Phoenix-Scottsdale Franchise Agreement.  (Compl. ¶ 20.)  Agado and Defendant Richard Folmar guaranteed GCEP-Goodyear's obligations under the Goodyear Franchise Agreement.  (Id. ¶ 18.)  And Agado and Folmar along with Defendants Michael Merriman and Caesar Perez guaranteed GCEP-Surprise's obligations under the Surprise Franchise Agreement.  (Id. ¶ 19.)

**II.     Termination of the Franchise Agreements**

Defendants operated the restaurants successfully for a number of years despite an economic downturn.  They have built a customer base and currently employ approximately 170 people.  (Agado Aff. ¶ 7.)  However, in 2010, economic conditions in Arizona continued to deteriorate and Defendants considered selling their restaurants.  (Id. ¶ 5.)  They nearly reached an agreement to sell the restaurants back to BWW for $4.6 million, but after they were unable to renegotiate the leases for their restaurants, this deal was never finalized.  (Id.)  In December 2010, Defendants allegedly breached their Franchise Agreements by failing to pay required royalty fees and advertising fees, make certain vendor payments, and accept credit cards.  (Essick Decl. ¶¶ 14-15; Compl. ¶ 29.)

BWW sent Defendants several Notices of Default regarding their late and missed payments in December 2010 and January 2011.  (See Compl. Exs. E-F.)  The defaults were not cured with respect to the Pheonix Restaurant, so BWW terminated its Franchise Agreement with GCEP regarding that restaurant location on February 10, 2011.  (Id. Ex. E.)  In the termination notice, BWW also informed GCEP that it intended to "enforce its rights under the Franchise Agreements, including all post-termination obligations set forth therein."  (Id.)  It also reserved its rights to any causes of action against GCEP.

Following this termination, Agado had discussions with a representative of BWW, and BWW apparently agreed to allow GCEP to "temporarily operate" the Phoenix Restaurant until a "Close Date" of April 15, 2011.  (Id.)  As of the close of business on that date, GCEP was to permanently close and cease operating the Phoenix Restaurant. (Id.)  BWW wrote to GCEP on April 12, 2011, reminding it of the approaching Close

4

Date and informing it that BWW would expect full compliance with all post-termination obligations set forth in the Franchise Agreements.  (Id.)  Nonetheless, it appears that the Pheonix restaurant continued operating as it had been even after April 15.

Meanwhile, GCEP-Goodyear and GCEP-Surprise cured their initial defaults.  In May 2011, however, BWW learned that they had again failed to make timely payments to a third-party vendor and to pay royalties and advertising fees they owed.  (Id. Ex. F.)  Accordingly, BWW terminated the Franchise Agreements with respect to the Goodyear and Surprise restaurants on May 26, 2011.  (Id.)  BWW also informed GCEP-Goodyear and GCEP-Surprise in the termination notice of its intent to enforce the post-termination obligations set forth in the Franchise Agreements.  (Id.)  These obligations include de-identifying the interior and exterior of the restaurant to eliminate identification as a BWW franchise and removing all of BWW's marks; they are set forth in Section 14 of the Franchise Agreements.  (Compl. Exs. B-D.)

## III.    Limited Reinstatement Agreement

Following the termination of the Goodyear and Surprise Franchise Agreements, BWW and the GCEP entities commenced negotiations regarding the closure of the three restaurants at issue.  Defendants wanted time to sell their interests in the restaurants, and BWW agreed to allow them to continue operating for a limited time while attempting to sell in order to preserve brand goodwill and avoid interruption of service.  (Essick Decl. ¶¶ 17-20; Compl. ¶¶ 32-34.)  On July 29, 2011, BWW and Defendants[4] executed a Limited Reinstatement Agreement to formalize this new arrangement.  (Compl. Ex. G.)

---

[4] All Defendants were parties to the Limited Reinstatement Agreement.  (Compl. Ex. G.)

The Limited Reinstatement Agreement reinstated the Franchise Agreements for a period of 90 days.  It provided that its sole purpose was "to permit the GCEP Parties to sell or assign their interests in the Phoenix Restaurant, the Goodyear Restaurant, and the Surprise Restaurant," and Defendants agreed to use "diligent efforts" to sell their interests during the reinstatement term.  (Id. §§ I.J, II.A.)  It also provided that it would expire on October 20, 2011, "without any opportunity for any renewal or extension thereof."  (Id. § II.A.)  Various acknowledgements and waivers were also part of the agreement. Defendants acknowledged, for instance, that the Pheonix Franchise Agreement was terminated on February 10, 2011, the Goodyear and Surprise Franchise Agreements were terminated on May 26, 2011, and "the Notices of Default and the Terminations of the Franchise Agreements were valid and proper."  (Id. §§ I.B, I.C.)

During the 90-day reinstatement period, Defendants spent "a considerable amount" of time and energy attempting to find potential purchasers for their restaurants. (Agado Aff. ¶ 9.)  However, they were unable to reach an agreement with any potential purchasers prior to the October 20 expiration date.  (Id.)

## IV.    Expiration of the Limited Reinstatement Agreement

Pursuant to its terms, the Limited Reinstatement Agreement expired on October 20, 2011, and Defendants had not sold their franchises by that time.  (Compl. ¶ 39.)  The next day, a BWW Franchise Consultant, Conrad Skowronski, visited the three restaurants, observing that they continued using the BWW marks.  (Skowronski Decl. ¶¶ 4-7.)  For instance, each restaurant was still clearly marked with BWW signage, customers were ordering, eating, and drinking BWW menu items, and BWW trademarks,

logos, symbols, and slogans were still in use throughout the interiors and exteriors of the restaurants.  (Id. ¶¶ 5-7.)  Skowronski visited each restaurant again on October 28 and observed that nothing had changed.  (Id. ¶ 9.)

Nevertheless, Defendants continued to have interaction and communication with BWW after October 20 regarding their restaurant operations.  (Agado Aff. ¶ 10.)  For instance, on October 21, BWW withdrew $14,862.67 from Defendants' bank accounts for royalties and advertising fees (id. ¶ 11), and on October 28 it withdrew an additional $12,994.81 for such fees (id. ¶ 16.)  On October 25, the Vice President of Franchise Relations and Development for BWW sent an email to Defendants, providing them with information about rebates they were entitled to receive, a new salad bowl they were required to implement in the coming year, and a virtual gift card program that was going to launch in November.  (Id. ¶ 13.)  They also received communications from BWW's Manager of Finance and Pricing Analysis regarding price points for the first quarter of 2012.  (Id. ¶¶ 14-15.)  Additionally, each of the three restaurants received their "GEM" report for October, a document laying out how the restaurants scored in various areas and how they ranked compared to other BWW restaurants in the region.  (Id. Ex. F.)

Communications between BWW and Defendants continued into November, including communications about approved vendors, menu item selection, pricing, and training events.  (Id. ¶¶ 18, 23-24.)  Automated withdrawals of royalties and advertising fees also continued into November; BWW withdrew payments on November 4, November 14, and November 18, bringing the total amount of money withdrawn from Defendants' accounts for royalties and fees after October 20 to over $70,000 (though

7

$15,760.24 of those funds were later credited back to Defendants).  (Id. ¶¶ 19, 25-26.)

Defendants continued to operate their restaurants in the same manner they had

previously, continuing to buy proprietary BWW products from approved vendors and to

operate as a BWW franchise.  (E.g., Suppl. Agado Aff. ¶ 6.)

## V.    Bankruptcy proceedings and litigation

On August 5, 2011, shortly after executing the Limited Reinstatement Agreement

and while it was still in effect, the GCEP entities filed for Chapter 11 bankruptcy

protection in the United States Bankruptcy Court for the District of Arizona.  (Compl. ¶

38.)  When BWW learned Defendants were continuing to operate using its marks after

October 20, it instituted an adversary proceeding against the GCEP entities in the

bankruptcy case on October 28, 2011.  (Id. ¶ 43.)  It also moved for temporary and

preliminary injunctive relief; however, before that motion was resolved, the attorney

representing the GCEP entities in the bankruptcy case withdrew, and the case was

subsequently dismissed on November 4.  (Id. ¶¶ 42-44; Diedrich Decl. Ex. 1.)

BWW, whose principal place of business is in Minnesota, then commenced the

instant action in this Court on November 8 and moved for a TRO and Preliminary

Injunction.  The initial hearing on its Motion was canceled after the Court learned that at

least some of the GCEP Defendants had filed for bankruptcy again, this time in the

Southern District of Texas.  (See Doc. Nos. 20, 21.)  That bankruptcy proceeding was

voluntarily dismissed, however, and the parties are proceeding to litigate in the instant

action.  BWW's Motion has been fully briefed, the Court heard oral arguments on

December 6, 2011, and the matter is now ripe for decision.

## STANDARD OF DECISION

This Court must consider four factors to determine whether preliminary injunctive relief is warranted: (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm injunctive relief would cause to the other litigants; and (4) the public interest. E.g., Watkins, Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003) (quoting Dataphase Sys., Inc. v. CL Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981) (*en banc*)). When analyzing these factors, the Court should "flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene." Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc., 182 F.3d 598, 601 (8th Cir. 1999). A preliminary injunction "is an extraordinary remedy never awarded as a matter of right." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 9 (2008). The burden of establishing the four Dataphase factors lies with the party seeking injunctive relief. Watkins, 346 F.3d at 844.

## ANALYSIS

### I.    Likelihood of Success

In order to obtain a preliminary injunction, BWW must show that it has a "fair chance of prevailing" on its claims. Planned Parenthood Minn., N.D., S.D. v. Rounds, 530 F.3d 724, 732 (8th Cir. 2008) (en banc). "An injunction cannot issue if there is no chance on the merits." Mid-Am. Real Estate Co. v. Ia. Realty Co., 406 F.3d 969, 972 (8th Cir. 2005). However, the question is not whether BWW has "prove[d] a greater than fifty percent likelihood that [it] will prevail," PCTV Gold, Inc. v. SpeedNet, LLC, 508

F.3d 1137, 1143 (8th Cir. 2007), but rather whether any of its claims provide a "fair ground for litigation," Watkins, 346 F.3d at 844.  "In considering the likelihood of the movant prevailing on the merits, a court does not decide whether the movant will ultimately win." PCTV Gold, 508 F.3d at 1143.  In the Court's view, BWW has shown sufficient likelihood of success on its claims to satisfy the first Dataphase factor.

A.    Trademark claim

The Lanham Act prohibits the unauthorized use of another's registered trademark without the registrant's consent in a manner that is "likely to cause confusion, or to cause mistake, or to deceive."  15 U.S.C. § 1114(1)(a).  Such unauthorized use gives rise to liability and may be enjoined.  Id. § 1116(a).  BWW presents ample evidence that Defendants are using its marks and that such continued use (assuming it is unauthorized) is likely to cause consumer confusion or lead to mistaken beliefs that the restaurants are still BWW franchises.  See, e.g., Country Inn & Suites by Carlson, Inc. v. Two H.O. P'ship, Civ. No. 01-1214, 2001 WL 1587903, at *2 (D. Minn. Nov. 19, 2001) (Tunheim, J.) (quoting Downtowner/Passport Int'l Hotel Corp. v. Norlew, Inc., 841 F.2d 214, 219 (8th Cir. 1988) (citations omitted)) ("[C]ommon sense compels the conclusion that a strong risk of consumer confusion arises when a terminated franchisee continues to use the former franchisor's trademarks.").

Defendants do not dispute that BWW's marks are valid and protectable, nor do they dispute that the continued use of those marks is likely to cause confusion among consumers.  Rather, they raise affirmative defenses to BWW's Lanham-Act claim. Defendants specifically contend that BWW cannot prevail on the merits of its trademark

claim because, through its course of conduct, it acquiesced to their continued use of the marks and/or modified (i.e., extended) their Franchise Agreements.  (See, e.g., Mem. in Opp'n 14-15.)  The Eighth Circuit recognizes that "[a]cquiescence may bar an infringement suit when 'the owner of the trademark, by conveying to the defendant through affirmative word or deed, expressly or impliedly consents to the infringement.'"  Masters v. UHS of Del., Inc., 631 F.3d 464, 469 (8th Cir. 2011) (quoting 3M Co. v. Intertape Polymer Grp., Inc., 423 F. Supp. 2d 958, 965 (D. Minn. 2006) (Tunheim, J.)).  Based on the record here, however, the Court cannot agree that BWW acquiesced to Defendants' continuing infringement or extended the Franchise Agreements.

In the weeks leading up to the expiration of the Limited Reinstatement Agreement, BWW repeatedly informed Defendants that their rights to use the marks would expire on October 20 and would not be extended.  The day after the Agreement expired, Skowronski visited the restaurants and observed that they continued to use the marks, and BWW informed Defendants on October 25 that their rights to use the marks had expired and they were violating the terms of their Agreements.  (See Compl. Ex. L.)  In that same letter, BWW warned Defendants that unless they ceased operating and complied with their post-termination obligations by October 27, it would institute an adversary proceeding and seek injunctive relief.  (See id.)  BWW proceeded to do just that, commencing an adversary proceeding in the pending bankruptcy case in Arizona on October 28, and moving for injunctive relief against the GCEP entities three days later.  (Compl. ¶¶ 42-43.)  When the first bankruptcy case was dismissed, precluding BWW from pursuing its adversary proceeding and motion for injunctive relief there, it filed the

11

instant action four days later.  And, when it learned that at least some of the GCEP
Defendants had filed for bankruptcy a second time in the Southern District of Texas,
BWW took action in that proceeding, arguing yet again that Defendants had no right to
use the BWW marks.  (See Bundy Decl. Ex. 1.)

In short, BWW put Defendants on notice numerous times both before and after the
expiration of the Limited Reinstatement Agreement that it did *not* consent to their
continued use of the marks and intended to enforce its trademark rights.  See Elvis
Presley Enters., Inc. v. Elvisly Yours, Inc., 936 F.2d 889, 897 (6th Cir. 1991) ("Shaw's
knowledge that [plaintiff] intended to enforce its [trademark] rights against Shaw also
defeats the 'acquiescence' defense.").  There is no evidence that BWW ever affirmatively
represented to Defendants that it would not enforce its trademark rights.  Instead,
Defendants rely solely upon its conduct to find implied consent—namely, its continued
communications about franchise matters and withdrawal of royalty fees.  However, most
of the conduct it identifies comprises mass communications and automated transactions
that were likely inadvertent on BWW's part.  For instance, nearly all of the e-mails in the
record were addressed to "Franchisees" or "All."  (E.g., Agado Aff. Exs. C, E, F.)  See
Prosperity Sys, Inc. v. Ali, No. CCB-10-2024, 2010 WL 5174939, at *4 (D. Md. Dec. 15,
2010) (rejecting argument that trademark owner acquiesced and noting "[a]cquiescence
requires evidence of active, not merely passive consent by the trademark owner").

Furthermore, to the extent BWW's actions and communications towards
Defendants were intentional, courts have found that a franchisor's continued support of
terminated franchisees' operations need not preclude them from obtaining an injunction.

The Southern District of Florida addressed this argument in a similar case involving a

Burger King franchise:

> The defendants' contention fails to appreciate the fact that it is the defendants' very conduct which places Burger King in a position of choosing between two evils. That is, if after proper termination the defendants refuse to cease utilizing the Burger King Corporation trademarks and continue doing business as a Burger King restaurant, Burger King, as a matter of policy, must choose between continuing to sell a terminated franchisee approved Burger King materials and supplies to ensure the quality of the food products or must cease selling approved Burger King products to a terminated franchisee knowing that they will secure food products from some other source and sell them as Burger King products. Viewed in this light, Burger King Corporation's policy-choice of continuing to sell their approved products to insure quality to the consuming public is a reasonable and valid decision under the circumstances created by the defendants and *should not intrude upon the plaintiff's right or entitlement to a preliminary injunction.*

Burger King Corp. v. Lee, 766 F. Supp. 1149, 1156 (S.D. Fla. 1991) (citation omitted)

(emphasis in original). The same is true here. It is Defendants' own conduct (repeated

non-payments) that led to termination of their Franchise Agreements, and the fact that

BWW continued to interact with the restaurants regarding operational matters while

simultaneously attempting to enforce its legal rights does not undermine its likelihood of

success or preclude it from obtaining the injunctive relief it seeks.

In the Court's view, a handful of automated bank withdrawals and

communications regarding the restaurants' operations over the span of a few weeks

following October 20 cannot constitute implied consent to Defendants' use of BWW's

marks or modification of the Franchise Agreements in the face of multiple, express

communications to the contrary.  The Court finds that BWW has shown a sufficient likelihood of success on the merits of its Lanham-Act claim.[5]

B.      Contract claim

BWW also asserts a breach-of-contract claim against Defendants, alleging that they are in breach of their post-termination obligations (i.e., to de-identify with the BWW brand) under the Franchise Agreements and Limited Reinstatement Agreement.  In response, Defendants argue that they cannot be in breach of their post-termination obligations under the contracts because those obligations have yet to be triggered.  They rely upon Section III.D of the Limited Reinstatement Agreement, which provides that they would be bound by all post-termination covenants set forth in their original Franchise Agreements on and after the earlier of (i) the date of the authorized sale of the restaurants; or (ii) the date upon which the restaurants "close[]."  It is undisputed that none of the restaurants was sold during the reinstatement term.  Hence, Defendants now argue that since the restaurants also have yet to "close"—that is, to cease operating—this provision has not been triggered.  The Court cannot agree with this interpretation.

---

[5] At oral argument, defense counsel characterized its acquiescence argument as "estoppel by acquiescence."  In some circuits, an acquiescence defense requires proof of undue prejudice to the defendant as a result of the purportedly acquiescing conduct.  E.g., Times Mirror Magazines, Inc. v. Field & Stream Licenses Co., 294 F.3d 383, 395 (2d Cir. 2002) (listing elements of acquiescence defense, including requirement that "the delay between the active representation [of consent] and assertion of the right or claim . . . caused the defendant undue prejudice").  The Eighth Circuit, however, appears to treat acquiescence and estoppel as separate defenses.  See Masters, 631 F.3d at 469 (characterizing acquiescence and estoppel as distinct, but "similar[]," equitable defenses).  In any event, to the extent that Defendants assert an estoppel defense (or to the extent that an acquiescence defense requires a showing of prejudice), there is absolutely no evidence that Defendants acted in reliance upon or were prejudiced in any way by their belief that BWW consented to their use of its marks after October 20.

Defendants' reading of this provision in isolation leads to an absurd result that is inconsistent with the rest of the Limited Reinstatement Agreement, the Franchise Agreements, and the parties' clear intentions.  See, e.g., Brookfield Trade Ctr., Inc. v. Cnty. of Ramsey, 584 N.W.2d 390, 394 (Minn. 1998) ("We read contract terms in the context of the entire contract and will not construe the terms so as to lead to a harsh and absurd result.") (citations omitted).  The Limited Reinstatement Agreement provides that Defendants' franchise rights would "automatically expire without further action or notice by BWW effective 12:00 AM on October 20, 2011, and without any opportunity for any renewal or extension thereof."  (Compl. Ex. G § II.A.)  It further provides that none of the Defendants would have "any further authority or right to operate the Restaurants except as specifically set forth in this Agreement."  (Id. § I.E.)  Read in its entirety, the Limited Reinstatement Agreement temporarily extended Defendants' franchise rights, but those rights would automatically and finally expire on October 20, after which point Defendants would no longer be authorized to continue operating their restaurants as BWW franchises.  In the Court's view, interpreting the Agreement in such a way that Defendants' refusal to close their restaurants despite the expiration of their franchise rights now shields them from compliance with their post-termination obligations would be an entirely "absurd result."

In short, the evidence before the Court suggests that the Franchise Agreements and Limited Reinstatement Agreement are valid contracts, binding on both BWW and Defendants.  Defendants offer no argument to the contrary.  Further, there can be no serious dispute that Defendants have continued to operate their restaurants and hold them

15

out as BWW franchises, and they have not removed signage or done anything else to de-identify, thus breaching the post-termination obligations set forth in their Agreements.  In the Court's view, BWW has shown a sufficient likelihood of success on its claim that Defendants are in breach of one or more of the contract provision(s).

## II.   Irreparable harm

"The basis of injunctive relief in the federal courts has always been irreparable harm and the inadequacy of legal remedies." Bandag, Inc. v. Jack's Tire & Oil, Inc., 190 F.3d 924, 926 (8th Cir. 1999) (*per curiam*) (quoting Beacon Theaters, Inc. v. Westover, 359 U.S. 500, 506–07 (1959)).  "Thus, to warrant a preliminary injunction, the moving party must demonstrate a sufficient threat of irreparable harm." Id.; accord, e.g., Winter, 555 U.S. at 22.  BWW asserts it is entitled to a presumption of irreparable harm because Defendants are infringing its trademarks. See Mut. of Omaha Ins. Co. v. Novak, 836 F.2d 397, 403 n.11 (8th Cir. 1987) (citations omitted).  In response, Defendants rely upon eBay Inc. v. MercExchange, LLC, 547 U.S. 388, 392-93 (2006), a patent case in which the Court rejected the notion that an injunction should automatically follow a determination that a patent has been infringed.  Since eBay and the Supreme Court's subsequent decision in Winter, some courts have held that it is no longer proper to presume irreparable harm when a plaintiff seeking a preliminary injunction has shown it is likely to succeed on a claim of patent (or copyright) infringement. See, e.g., Salinger v. Colting, 607 F.3d 68, 76-82 (2d Cir. 2010).  The Supreme Court has not clarified,

however, and the Eighth Circuit has yet to address, whether a presumption of irreparable

harm still applies in *trademark* cases following <u>eBay</u> and <u>Winter</u>.[6]

Regardless of whether a presumption applies, however, the Court finds that BWW

has shown a sufficient threat of irreparable harm here.  It has offered ample evidence that

"its marks are widely known and associated exclusively with [BWW]-approved vendors

and franchises" and that the marks "represent and embody [BWW]'s considerable

goodwill and favorable reputation."  <u>Gold's Gym Licensing, LLC v. K-Pro Mktg. Grp.,</u>

<u>Inc.</u>, 09-CV-1211, 2009 WL 2253247, at *2 (D. Minn. July 28, 2009) (finding that even

if the presumption were inapplicable, such evidence supported a finding of irreparable

harm).  Courts have long held that "[p]otential loss of goodwill qualifies as irreparable

harm."[7]  <u>E.g.</u>, <u>Bel Canto Design, Ltd. v. MSS HiFi</u>, --- F. Supp. 2d ---, 2011 WL

---

[6] Numerous decisions of this Court have continued to recognize a presumption in trademark-infringement cases post-<u>eBay</u>, often without any mention or analysis of that decision.  <u>E.g.</u>, <u>Medtronic, Inc. v. Brasseler USA, Inc.</u>, Civ. No. 11-1404, 2011 WL 4899980, at *4 (D. Minn. Oct. 14, 2011) (Davis, J.) ("[Plaintiff] has failed to establish a likelihood of confusion which would entitle it to a presumption of irreparable harm" on trademark claim); <u>George & Co., LLC v. Xavier Enters., Inc.</u>, Civ. No. 09-2973, 2009 WL 4730331, at *5 (D. Minn. Dec. 4, 2009) (Frank, J.) (presuming irreparable harm on trademark-infringement claim where plaintiffs demonstrated a showing of likelihood of confusion); <u>Gold's Gym Licensing, LLC v. K-Pro Mktg. Grp., Inc.</u>, No. 09-CV-1211, 2009 WL 2253247, at *2 (D. Minn. July 28, 2009) (Schiltz, J.) (same); <u>J & B Wholesale Distrib., Inc. v. Redux Beverages, LLC</u>, 621 F. Supp. 2d 678, 689 (D. Minn. 2007) (Davis, J.) (same).  In fact, the only District of Minnesota case Defendants cite for the proposition that the presumption should *not* apply to trademark-infringement cases is <u>Travel Tags, Inc. v. UV Color, Inc.</u>, 690 F. Supp. 2d 785, 797-98 (D. Minn. 2010) (Tunheim, J.) ("[D]istrict courts conducting preliminary injunction analysis *in patent infringement cases* no longer apply a . . . presumption or irreparable harm.") (emphasis added).  Here, however, the Court need not (and does not) opine on the soundness of these decisions, because it finds irreparable harm has been sufficiently established even without applying a presumption.

[7] Defendants acknowledged as much in the Limited Reinstatement Agreement, in which they agreed that "monetary damages [would] be inadequate to remedy the damage caused to BWW in the event that the Franchisees operate the Restaurants after the termination of this Agreement without BWW's written authorization."  (Compl. Ex. G § V.E.)

4036409, at *4 (D. Minn. 2011) (Doty, J.) (quoting <u>Ia. Utils. Bd. v. FCC</u>, 109 F.3d 418, 426 (8th Cir. 1996)).  A former franchisee's continued use of a franchisor's marks after termination of the franchise agreement poses a substantial risk to the franchisor's brand reputation and goodwill.  The Northern District of Texas aptly explained the nature of that threat:

> [T]hrough defendants' continued passing off of their restaurants as [] franchises after the termination of the franchise agreements, [the franchisor] has lost control over its valuable trademarks and the quality of the restaurants operating under its name. This lost control poses a substantial threat of injury to [the franchisor's] reputation and the goodwill it has built in its brand. Such injury is irreparable, as it cannot be remedied through monetary damages.

<u>TGI Friday's, Inc. v. Great Nw. Restaurants, Inc.</u>, 652 F. Supp. 2d 763, 771 (N.D. Tex. 2009); <u>accord, e.g.</u>, <u>Petro Franchise Sys., LLC v. All Am. Props., Inc.</u>, 607 F. Supp. 2d 781, 795 (W.D. Tex. 2009) ("[I]f Franchisees fail to provide the quality of service customers expect, customers will almost certainly attribute the poor service to [the franchisor] and could be discouraged from returning to other [] franchises in the future.").

In this Court's view, allowing Defendants to continue operating the restaurants using BWW's marks and to hold them out as BWW franchises poses a significant threat of irreparable harm to BWW's reputation and goodwill.

## III.   Balance of harms and public interest

In addition to showing likelihood of success on the merits and irreparable harm, BWW must also establish that the balance of hardships and public interest favor granting preliminary injunctive relief.  In the Court's view, it has done so.

BWW argues that the harm it will suffer without this injunction (harm to its brand reputation and goodwill, etc.) is great, while the harm to Defendants is limited and "self-inflicted." Sierra Club v. U.S. Army Corp. of Eng'rs, 645 F.3d 978, 997 (8th Cir. 2011) (noting defendant's harm was "largely self inflicted"). Defendants respond, however, that they will be immensely harmed if the injunction is granted because it will force them out of business and put approximately 170 employees out of work, while the harm to BWW without injunctive relief would be "minimal" and "compensable by money damages." (Mem. in Opp'n 21-22.) As set forth above, BWW has shown that it faces a substantial likelihood of irreparable harm if an injunction is not granted. Furthermore, Defendants have indeed brought this harm upon themselves through their non-payment and infringement. See, e.g., S & R Corp. v. Jiffy Lube, Int'l, Inc., 968 F.2d 371, 379 (3d Cir. 1992) (noting that defendant "brought much of the difficulties of which he complains upon himself" by "cho[osing] to stop paying royalties, for example"); Wetzel's Pretzels, LLC v. Johnson, --- F. Supp. 2d ---, 2011 WL 2533315, at *7 (C.D. Cal. June 27, 2011) (finding balance of hardships favored franchisor; even though franchisee would likely have to close and lay off employees if enjoined, "it is [the franchisee] that brought on those risks"). While the Court is sympathetic to the loss of employee jobs that may result, this is harm to third parties and is of little relevance to the balance-of-hardships analysis. Furthermore, the Defendants recent bankruptcy filings suggest that their restaurants may well have been forced to close irrespective of the instant action. In the Court's view, this factor weighs in favor of BWW.

Finally, BWW argues that the public interest favors a preliminary injunction in order to eliminate the confusion caused by trademark infringement.  This Court has repeatedly recognized that the public interest is promoted by "preventing customer confusion and infringement of trademarks."  Gold's Gym, 2009 WL 2253247, at *2 (citations omitted); accord, e.g., Am. Dairy Queen Corp. v. New Line Prods., Inc., 35 F. Supp. 2d 727, 733 (D. Minn. 1998) ("[Congress] has clearly expressed its support for, and the public's interest in, trademark protection.  Infringement . . . of trademarks [is] inherently contrary to the public interest.").  Defendants counter that the public interest would be disserved by an injunction because it would result in "loss of a gathering spot and a decrease in the availability of dining options," as well as putting numerous employees out of work and burdening taxpayers.  (Mem. in Opp'n 23.)  Yet the fact that Defendants have already filed for bankruptcy—twice—suggests that these harms would likely have occurred regardless whether an injunction is issued here or not.  Accordingly, the Court finds the public interest also favors BWW.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED**:

1)      BWW's Motion for TRO and Preliminary Injunction (Doc. No. 7) is **GRANTED**;

2)      Defendants, as well as all other guarantors, officers, directors, members, managers, agents, employees, and persons acting in concert with them, who receive actual notice of this Order, are hereby **ENJOINED**, as of the effective date of this Order,

from using the BWW trademarks, trade name and dress, and from associating with the BWW franchise system;

3)      Defendants are **ORDERED** to comply with their obligations to de-identify with the BWW brand as set forth in Section 14.A of the Franchise Agreements between the parties.  To be clear, this means that Defendants shall discontinue their use of the BWW marks or any name, logo, slogans, or symbols or other designations that might tend to give the impression that their restaurants are associated with BWW or its brand. All de-identification must be completed within five business days of the date this Order becomes effective; and

4)      BWW is **ORDERED** to file as security a bond in the amount of $50,000; this Order will take effect upon the filing of such bond.


Dated: December 9, 2011                    s/Richard H. Kyle
                                           RICHARD H. KYLE
                                           United States District Judge